MYERS, P.J.,
 

 for the Court.
 

 ¶ 1. Robert McKinney was indicted and tried on two counts of aggravated assault, one count of murder, and one count of possession of a firearm by a convicted felon. A jury acquitted McKinney of one charge of aggravated assault, but convicted him of the other. The jury also found McKinney guilty of murder and possession of a firearm by a convicted felon. The trial court sentenced McKinney to twenty years for the aggravated assault, life for the murder, and three years for the possession of a firearm by a convicted felon. The sentences were ordered to run consecutively, all in the custody of the Mississippi Department of Corrections. Aggrieved, McKinney appeals his convictions and sentences. Finding no error, we affirm.
 

 FACTS
 

 ¶ 2. Hessie Taper owned PDR Grocery, a small convenience store in Lambert, Mississippi. Hessie lived in an apartment attached to the store with her daughter Marvella Taper and her granddaughter. William “Shang” Taper, Hessie’s ex-husband, and their son, Antonious “Tony” Taper, visited the store and apartment regularly.
 

 ¶ 3. On April 3, 2006, McKinney, the father of Marvella’s baby, traveled from
 
 *1067
 
 Memphis, Tennessee, to visit Marvella and the child. Upon arrival, McKinney went in the store and then on to the apartment through an interior door. Shang, seeing McKinney, took the opportunity to talk to him about furniture Shang had cosigned for when Marvella and McKinney were living together in Memphis. McKinney had kept the furniture and agreed to pay the notes, but he had not done so.
 

 ¶ 4. Hessie testified that she was in the store when she heard gunshots outside. She looked out and saw McKinney shooting across the street and aiming the gun at her son Tony. Tony was unarmed and moving around to avoid being shot. She then saw McKinney toss the pistol in his car, get into the car, and drive away. Hessie testified that she never saw Tony or Shang with a gun.
 

 ¶ 5. Shang testified that he encountered McKinney outside the apartment and talked to him about making payments on the furniture. They went inside the apartment and talked. They then moved outside again and the discussion became louder. Shang admitted to being scared of McKinney because McKinney was much larger than he was. Shang testified that McKinney walked toward his car that was parked in front of the store. McKinney then turned and began firing a pistol. Shang testified there were several people standing around outside talking including Len Huddleston and Lee Stevenson, who had been standing by the garbage bin. McKinney was the only one who was armed or shooting.
 

 ¶ 6. Jeannette Willis, Shang’s sister, testified she was parked across the street waiting for Shang. She observed Shang and McKinney arguing over the furniture payments and noticed that a group of people had gathered. She saw McKinney draw a gun and shoot. McKinney then walked toward a blue car and shot downward twice. Willis then heard people yell for Tony to run. McKinney stopped, turned back, and shot four more times at Tony. McKinney then put the gun in his car, got into the car, and drove away. She did not observe the spectators as threatening to McKinney.
 

 ¶ 7. Tony then testified to his version of the events. He had been outside talking when he observed McKinney talking “rough” about the furniture to his father, Shang. Tony testified that he did not argue with McKinney, but that “[McKinney] might have mumbled something to me. I might have mumbled something back.” Tony stated that he could not remember what he had said, but he denied that he or anyone else threatened McKinney. Tony testified that Huddleston had just come out of the store and was standing around talking to another individual, Austin Weathersby. Huddleston was unarmed. Tony testified McKinney and Huddleston did not know each other, and to his knowledge, they had not even spoken to each other. Tony testified that as he walked away, with his back to McKinney, the shooting stax*ted. Tony saw Hud-dleston, who he had been walking toward, struck with a bullet. When he turned around, Tony saw that McKinney was pointing the gun at him. Tony ducked down by the car and heard his father yell for him to run. McKinney continued to shoot at him, and Tony got up and ran. Tony testified that he was unarmed, but he stated that if he had a gun that day “it might have been a different outcome.”
 

 ¶ 8. Stevenson testified he had been hanging around outside the store with friends and had just walked around the side of the building to urinate. Stevenson had a 1980 blue Chevrolet parked next to the garbage bin. Huddleston was standing at Stevenson’s car door. Stevenson testified that no one gave McKinney a
 
 *1068
 
 reason to start shooting. When McKinney began shooting, Stevenson ran away, toward his home, which was nearby. After the shooting, Stevenson observed that the driver-side window of his car had been shot out.
 

 119. Stevenson testified that once the shooting started, he ran home, retrieved a pistol, and returned to the site of the shooting. However, when he returned, McKinney was gone. On cross-examination, Stevenson testified that to his knowledge McKinney was the only one with a gun when the shooting started. He also testified if he had a gun at the time of the shooting, he would not have run.
 

 ¶ 10. Cornelius Conley, an officer with the Lambert Police Department, testified he was on patrol when he heard several shots, which were followed by three rapid shots and a single shot. He stopped his ear, and through his side mirror, he observed McKinney standing beside a blue pickup, holding a handgun and shooting. When McKinney drove away from the scene, Officer Conley followed and observed McKinney toss a weapon out of the passenger-side window of his car. Officer Conley eventually initiated a “felony stop,” pulling his car in front of McKinney. Officer Conley and Officer Milton Williams with the Mississippi Bureau of Investigations subsequently retrieved McKinney’s gun.
 

 ¶ 11. Thomas Simpson, a supervisor for the town of Lambert, testified he drove up to the scene of the shooting. He observed the gunshots, saw the victim fall, and observed a man, who was later identified as McKinney, shooting and running to his green car. McKinney then left. At the time of the shooting, Simpson saw only McKinney with a gun. Minutes after McKinney left, Simpson saw another man come up to the scene with a pistol, get into a blue car, and leave. Simpson thought the man came from the alley behind him. He told the man not to leave, but Simpson backed off when he saw the pistol. Simpson radioed police units and requested that they stop the person with a gun leaving the scene in a blue car, which they did. Simpson was unable to identify Stevenson as the person in the blue car.
 

 ¶ 12. Investigator Williams with the Mississippi Bureau of Investigation testified that he assisted in the arrest of McKinney and conducted the investigation of the shooting. Investigator Williams testified that during the course of his investigation, he retrieved a 9mm pistol that belonged to Stevenson. Investigator Williams submitted Stevenson’s pistol to the Mississippi Crime Laboratory for testing. His investigation and test results showed that Stevenson’s pistol was not involved in the shooting.
 

 ¶ 13. The State established through the testimony of several witnesses that Hud-dleston was shot in the back of the head with McKinney’s 9mm pistol. Authorities recovered shell casings in front of PDR Grocery, one projectile from the hood of Shang’s pickup truck, and one projectile from the driver’s door of Stevenson’s blue car. The bullet removed from Huddle-ston’s head and the bullets and casings found at the scene of the shooting were all fired from McKinney’s gun.
 

 ¶ 14. Marvella testified for the defense. She stated that Tony was agitated and calling McKinney names. Tony told McKinney, “Pull it, pull it out [expletive],” and motioned under his shirt. McKinney went up under his shirt and pulled out a gun; Marvella ran into the apartment. On cross-examination, she testified that people were standing around outside her door, but they were not intimidating McKinney.
 

 ¶ 15. Defense witness Latteria Joy testified she was present in the apartment
 
 *1069
 
 when McKinney came to visit Marvella and the child. Joy testified that Shang and McKinney discussed the paying for the furniture. Tony came in the apartment arguing with McKinney. They went outside, came back in the apartment, and then went outside again. Shang was going to his truck, and Tony indicated he wanted to “pistol play.” Tony made motions to his side, but he did not have a gun. Joy testified while in the apartment with Mar-vella, Joy saw that McKinney had a gun in his “necessary pocket.” Before the shooting began, Joy saw Tony, two people standing behind him, and another person near the garbage bin. Joy quickly got her children inside the Tapers’ apartment and closed the door before the shooting began.
 

 ¶ 16. McKinney also called LaKizzy Ransom, a Lambert police officer who was off-duty at the time of the shooting to testify. Officer Ransom was parked down the street and observed the shooting. She testified that there were “a lot of people out there.” Officer Ransom heard shooting and saw a man, later identified by his clothes as McKinney, standing in the road shooting.
 

 ¶ 17. McKinney then testified to his version of events. McKinney stated that the discussion went back and forth between him and Shang, and Marvella told her father he was wrong while Tony kept interceding. They took the discussion outside and voices were raised; people started gathering around. McKinney told Marvella that he was leaving. McKinney testified that while he stood at the door, Shang approached “arguing at me,” while Tony walked up threatening McKinney and reaching up under his clothing. McKinney stated that he felt threatened and saw an individual with a gun and another individual getting into a blue Chevrolet car. He then drew his gun and fired at them because he felt threatened.
 

 ¶ 18. The jury acquitted McKinney of the aggravated assault of Shang, but convicted him of the aggravated assault of Tony, the murder of Huddleston, and possession of a firearm by a convicted felon. Aggrieved, McKinney appeals.
 

 DISCUSSION
 

 I. SELF-DEFENSE THEORY
 

 ¶ 19. On appeal, McKinney argues that the aggregate effect of several erroneous rulings by the trial court precluded him from adequately developing his theory of the case, which was that he acted in reasonable self-defense. We shall address each of these issues separately.
 

 A. Impeachment of Tony Taper
 

 ¶ 20. McKinney argues that the trial court erred in not permitting him to impeach Tony with a prior conviction that' was more than ten years old. Mississippi Rule of Evidence 609(a)(1)(A) provides that “[f]or the purposes of attacking the credibility of a witness,” evidence that “a nonparty witness has been convicted of a crime shall be admitted subject to Rule 408, if the crime was punishable by death or imprisonment in excess of one year.... ” Rule 609(b), however, provides in pertinent part that:
 

 Evidence of a conviction under this rule is not admissible if a period of more than ten years has elapsed since the date of the conviction ... unless the court determines, in the interests of justice, that the probative value of the conviction supported by the specific facts and circumstances substantially outweighs its prejudicial effect.
 

 “The grant or denial of a hearing to determine in advance the admissibility of a prior criminal conviction for impeachment purposes is discretionary.”
 
 Wilcher v. State,
 
 697 So.2d 1087, 1093 (Miss.1997) (quoting
 
 *1070
 

 Settles v. State,
 
 584 So.2d 1260,1264 (Miss.1991)).
 

 ¶ 21. McKinney asserts that the trial court abused its discretion in not weighing what he asserts is the “critical” probative value of Tony’s prior conviction for felon in possession of a firearm. McKinney argues that because Tony denied threatening him or possessing a firearm on the day of the shooting, evidence of a prior conviction for possessing a firearm was probative. This, however, confuses the issue. Rule 609 allows the use of prior convictions to impeach a witness’s credibility; it does not permit the introduction of past convictions to show a victim’s propensity to violence when the defendant alleges self-defense. Here, the past conviction is not particularly probative of honesty, and the events at issue occurred in the presence of numerous witnesses. Tony’s credibility, therefore, was not so central to proof of McKinney’s guilt that the trial court’s decision amounted to an abuse of discretion under Rule 609(b). This issue is without merit.
 

 B.
 
 Limited Cross-examination of Stevenson; Exclusion of Stevenson’s Gun from Evidence
 

 ¶22. McKinney argues that he should have been permitted to cross-examine Stevenson concerning a pistol which was recovered from the scene of the shooting. Stevenson testified that he fled during the shooting, retrieved the pistol from his home, and returned to the scene. By the time he returned, however, the incident was over and McKinney was gone. On the State’s motion, the trial court limited McKinney’s cross-examination of Stevenson on this issue to whether Stevenson had the gun at the time of the shooting, which Stevenson answered in the negative.
 
 [1]
 
 The trial court also refused to admit Stevenson’s gun into evidence.
 

 ¶ 23. The supreme court has held that “a criminal defendant is entitled to present his defense to the finder of fact, and it is fundamentally unfair to deny the jury the opportunity to consider the defendant’s defense where there is testimony to support the theory.”
 
 Randall v. State,
 
 806 So.2d 185, 209(¶ 54) (Miss.2001) (quoting
 
 Terry v. State,
 
 718 So.2d 1115, 1121(¶28) (Miss.1998)).
 

 ¶24. However, on our review of the record, we find no evidence before the trial court that Stevenson’s gun was present at the scene at the relevant times or that it was involved in any way; the testimony of the many witnesses to the shooting was unanimous that Stevenson did not have the pistol until after the incident. While McKinney did subsequently testify that he observed Stevenson make a threatening gesture with the pistol immediately before the shooting, this evidence was not offered to the trial court when it ruled on the motions, and defense counsel did not again attempt to introduce Stevenson’s pistol after a foundation for its admission had been laid. Therefore, we cannot find the trial court’s ruling in error.
 
 See id.
 
 Accordingly, this issue is without merit.
 

 C. Rejection of McKinney’s Jury Instructions
 

 ¶ 25. McKinney argues that the trial court erred in refusing four of his jury instructions.
 

 ¶ 26. “[Wjhile a defendant is entitled to have the jury instructed regarding
 
 *1071
 
 his theory of the case, the court may properly refuse an instruction if it states the law incorrectly, is covered elsewhere in the instructions, or is without an evidentiary foundation.”
 
 Cotton v. State,
 
 933 So.2d 1048, 1050(¶ 7) (Miss.Ct.App.2006) (citing
 
 Heidel v. State,
 
 587 So.2d 835, 842 (Miss.1991)).
 

 ¶ 27. In particular, McKinney argues that the trial court erred in refusing his manslaughter instructions, marked D-ll and D-12, which would have instructed the jury on heat-of-passion and culpable-negligence manslaughter, respectively. However, on our review of the record, neither instruction was supported by the evidence. D-ll stated in part: “If you find ... the Defendant was acting impulsively in the heat of passion after arguing with the decedent....”; but no evidence was introduced at trial that McKinney had ever spoken with the victim. In fact, McKinney testified that he shot Huddleston because the latter was getting into an automobile. Likewise, D-12 concerned culpable-negligence manslaughter, stating that the jury could find that McKinney fired “toward a group of people” and inadvertently hit Huddleston. McKinney, however, testified unequivocally that this was not the case; he acknowledged targeting Huddleston and deliberately shooting him. McKinney concedes that his remaining instructions, D-6 and D-15, which concerned self-defense, were adequately covered in other instructions given by the court. Accordingly, this issue is without merit.
 

 D. Conclusion
 

 ¶ 28. Finding no error on any individual issue, we find no error in the aggregate. This assignment of error is without merit.
 

 II. FAIR TRIAL
 

 ¶ 29. McKinney argues that the trial judge erred by making “multiple extraneous and inappropriate comments” that “diminished the solemnity of the proceedings” and denied McKinney a lair trial.
 

 ¶ 30. McKinney cites to several statements made by the trial court during the proceedings. He notes instances where the trial judge offered ad-libbed, folksy illustrations of questions during voir dire, admonished the venire for “giggling and whispering,” referred to a two-hour recess as “an afternoon nap,” and admonished a State witness for “laying [sic] back like he’s in the back seat of a car” while testifying.
 
 [2]
 
 McKinney also cites this illustration offered by the court during voir dire, which stated:
 

 I ask this in every case. We’ve had a couple of these little gangs that were around Clarksdale, Mississippi, and those jurors — you know, we made sure — I would ask the jurors, “Anybody tried to talk to you about the case?” We convicted a couple of those guys over there and things have really cooled down some. But has anybody attempted to talk to you about the case?
 

 McKinney argues that this statement suggested to the jury that McKinney was a member of a gang whose his conviction would “cool down” the community.
 
 [3]
 

 ¶ 31. McKinney made no contemporaneous objection to any of these statements in the trial court. On appeal, McKinney acknowledges the procedural bar, but he urges reversal, arguing that the aggregate effect of these comments denied him a fair
 
 *1072
 
 trial because the jury was induced to treat the matter lightly. McKinney urges that this Court teeat this matter as plain error.
 

 ¶ 32. The supreme court has stated:
 

 Jocularity and humor, by a court, should not be indulged in when a man’s liberty is at stake. The officers of a court, and especially the judge, district attorney and sheriff, because of the attributes of the offices they hold, unconsciously exert tremendous influence in the trial of a case, and they should be astutely careful so that unintentionally the jurors are not improperly influenced by their words and actions.
 

 Roberson v. State,
 
 185 So.2d 667, 670 (Miss.1966). “The great danger, particularly in a criminal case, is that the weight and dignity of the court accompan[y] each question or comment, although not so intended by the judge.... ”
 
 Thompson v. State,
 
 468 So.2d 852, 854 (Miss.1985).
 

 ¶ 33. We have thoroughly reviewed the record, and we are satisfied that McKinney received a fair trial. While we do not condone the apparent informality of some of the trial judge’s comments, we can find no instance where the trial court made light of the proceedings or joked at the defendant’s expense. Instead, the record reflects that the jury was made well aware of the importance of their role and their duty to conscientiously consider the evidence, apply the law, and reach a just verdict. Certainly, the trial court’s statements do not amount to plain error. This issue is without merit.
 

 ¶ 34. THE JUDGMENT OF THE CIRCUIT COURT OF QUITMAN COUNTY OF CONVICTION OF COUNT II, AGGRAVATED ASSAULT, AND SENTENCE OF TWENTY YEARS; COUNT III, MURDER, AND SENTENCE OF LIFE; AND COUNT IV, POSSESSION OF A FIREARM BY A CONVICTED FELON, AND SENTENCE OF THREE YEARS, WITH ALL SENTENCES TO RUN CONSECUTIVELY IN THE CUSTODY OF THE MISSISSIPPI DEPARTMENT OF CORRECTIONS, IS AFFIRMED. ALL COSTS OF THIS APPEAL ARE ASSESSED TO QUITMAN COUNTY.
 

 KING, C.J., LEE, P.J., IRVING, GRIFFIS, BARNES, ISHEE, ROBERTS, CARLTON AND MAXWELL, JJ., CONCUR.
 

 [1]
 

 . Defense counsel proffered that he wished to ask Stevenson whether the pistol was chambered in 9mm, the same caliber used by McKinney. Subsequently, a witness for the State testified that he had tested Stevenson’s gun and determined that, although it was a 9mm, it did not fire any of the bullets or shell casings recovered from the scene. Accordingly, we find that any error in limiting cross-examination of Stevenson was harmless.
 

 [2]
 

 . The record reflects that laughter followed some of these comments or illustrations.
 

 [3]
 

 . We note that the trial court granted McKinney’s motion to preclude the State from mentioning that McKinney may have been a gang member.